IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| ELV ASSOCIATES, INC., <br><br> Plaintiff, <br><br> v. <br><br> PARK OFFICE PROPERTIES II, LLC, <br><br> Defendant. | CIVIL ACTION <br> FILE NO. 04-cv-10930-RGS |

## BRIEF IN SUPPORT OF PARK OFFICE PROPERTIES II, LLC'S MOTION TO DISMISS

COMES NOW Defendant Park Office Properties II, LLC ("POP II") and files its Brief in Support of its Motion to Dismiss:

### *INTRODUCTION*

The genesis of this lawsuit is a complex commercial real estate transaction between two sophisticated investors with the benefit of counsel. Notwithstanding the reality of this transaction, Plaintiff ELV Associates, Inc. ("ELV"), suggests in its pleadings that it should be permitted to obtain a commercial advantage in the transaction because it failed to grasp that the letter of intent upon which it relies was not a binding contract. The courts of Massachusetts do not allow sophisticated parties to ignore the clear import of language that amounts to nothing more than business negotiation regarding a significant asset.

As the Massachusetts Appeals Court recognized in *Tull v. Mister Donut Development Corp.*, 7 Mass. App. Ct. 626, 389 N.E.2d 447 (1979):

> A commercial transaction of the kind which gave rise to this litigation often has many players the prospective landlord, the

> prospective tenant, the financing source of each, licensing authorities, and land use permit granting authorities. The final governing documents are generally complex, reflecting adjustments to the requirements of the various participants. These papers are far from being just another 'wheel in the machinery.' [Cit.Om.] Until the documents are signed and delivered the game is not over. ***Businessmen would be undesirably inhibited in their dealings if expressions of intent and the exchange of drafts were taken as legally binding agreements.***

Id. at 631-32; 450-51 (emphasis supplied).

Because ELV attached to its Complaint the relevant documents, they are considered part of the pleadings for all purposes under Fed.R.Civ.P. 10(c). An examination of those documents, together with the authorities cited within, leads to the inescapable conclusion that ELV's Complaint fails to state a claim upon which relief may be granted and authorizes this Court to dismiss that Complaint under Fed.R.Civ.P. 12(b)(6).

## STANDARD OF REVIEW

Under Fed.R.Civ.P. 12(b)(6), parties may move to dismiss a complaint for failure to state a claim upon which relief can be granted. In considering motions to dismiss under F.R.C.P. 12(b)(6), courts credit all well-pleaded facts and draw all reasonable inferences in favor of the plaintiff. *See Campagna v. Commonwealth of Massachusetts, Dept. of Environmental Protection*, 334 F.3d 150, 155 (1st Cir. 2003). However, courts do not give credit to bald assertions, unsupportable conclusions, opprobrious epithets, subjective characterizations or unsubstantiated conclusions. *See Campagna*, 334 F.3d at 155; *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 23 (1st Cir. 1990). If, after review, a complaint fails to allege facts in support of each material element necessary to sustain recovery under some actionable legal theory, the complaint is dismissed under F.R.C.P. 12(b)(6). *Fleming*, 922 F.2d at 23.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Offer

In early December, 2003, Plaintiff ELV became interested in acquiring an office building owned by Defendant POP II and located at Two Liberty Square (the "Property") in Boston, Massachusetts. *See* Complaint, ¶¶ 6-8. After touring the Property and reviewing some offering materials sent by Spaulding & Slye Colliers ("Spaulding and Slye"), a commercial real estate brokerage firm handling the sale, ELV submitted an offer to purchase the Property for $15,000,000.00. *Id.* at ¶¶ 7, 9. Shortly thereafter, two other potential purchasers submitted competing $15,000,000.00 bids. *Id.* at ¶ 9. ELV chose to begin preliminary due diligence regarding the Property. *Id.* at ¶ 10. By January 5, 2004, ELV had completed its preliminary due diligence and had acquired a letter of interest from Anglo-Irish Bank for financing of the proposed transaction. *Id.*

### B. The Letter of Intent

On January 13, 2004, ELV and POP II signed a letter of intent ("Letter of Intent"). *Id.* at ¶ 13, Ex. A. Paragraph 10 of the Letter of Intent provides as follows:

> This letter is being written with the understanding that, other than those provisions hereof which expressly call upon the parties to undertake or refrain from undertaking certain actions upon the execution of this letter of intent and the indemnities described herein which shall expressly survive, during the period subsequent to the full execution of this letter of intent until the purchase and sale agreement is executed, ***no party will be bound by any of the terms until negotiations have been concluded and a definitive purchase agreement has been executed covering all of the foregoing and such considerations as either of the parties deems appropriate***. *Neither the expenditure of funds by either of us or our undertaking actions to investigate the Property will be regarded as the partial performance of a binding agreement or entitle the party expending funds or taking action to any right to assert claims for reimbursement of damages against the other party. This letter is **intended to be an expression of our interest** in the Property and our willingness to continue to negotiate in good faith effort to reach a definitive agreement.*

Complaint, Ex. A, ¶ 10, pp. 4-5 (emphasis added).

3

### C. Subsequent Negotiations

Prior to executing the Letter of Intent, the parties discussed a definitive purchase and sale agreement. *Id.* at ¶¶ 19, 20. Prior to executing the draft purchase and sale agreement circulated between the parties however, POP II was informed by its commercial mortgage lender that a pre-payment penalty of approximately $600,000.00 would be imposed if the mortgage on the Property was paid-off as a result of the proposed sale. *Id.* at ¶ 25.

ELV fails to discuss how a pre-payment penalty operates in this transaction. In this instance, calculation of the pre-payment penalty was not as simplistic as ELV argues in its pleading and brief. While Plaintiffs would have the Court believe that it is a simple matter of looking to a document or a bank rate to calculate such a penalty, pre-payment penalties may also operate by reference to arbitraged rates. This latter method is not calculable by a borrower, and is in fact what accompanied the German financing on this asset. Upon learning of the enormous pre-payment penalty, POP II informed ELV that it would not execute a purchase and sale agreement without first resolving the pre-payment penalty issue with the lender. *Id.* As a result, no purchase and sale agreement for the Property was signed by POP II or its representatives. *Id.* at ¶ 28.

After learning of the $600,000.00 pre-payment penalty, POP II did not break off its negotiations with ELV to sell the Property. *Id.* at ¶ 29. Rather, POP II told ELV several times that it was attempting to work out the pre-payment penalty issue in hopes of eventually completing the sale of the Property to ELV. *Id.* ELV, however, instead filed the instant suit against POP II on April 12, 2004 in the Superior Court of the Commonwealth of Massachusetts. On May 10, 2004, POP II timely removed the case to this Court.

3699540_1.DOC
3699540v1

## *ARGUMENT AND CITATION OF AUTHORITY*

**A.    POP II Cannot Be Compelled To Convey Property Against Its Will Where No Enforceable Agreement Exists.**

ELV seeks through this action to have the Court order POP II to part with its property at a substantial loss due to the impact of the prepayment penalty. The starting point for the Court's analysis should be whether an enforceable conveyance agreement exists between the parties. Because this transaction involves the transfer of real property, it is governed by the Statute of Frauds.[1] The Statute of Frauds provides in pertinent part that:

> No action shall be brought . . . [u]pon a contract for the sale of lands, tenements, or hereditaments or of any interest in or concerning them . . . unless the promise, contract, or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized.

G.L. c. 259, § 1.

To comply with the Statute of Frauds then, ELV must demonstrate that it has a written, signed agreement for conveyance of the property or that some other form of agreement, deemed suitable under the Statute of Frauds, compels the conveyance. It is undisputed that the draft purchase and sale agreement was never executed by POP II. Thus, in order to state a claim, ELV must argue that the Letter of Intent compels the conveyance. That argument fails as a matter of law because the Letter of Intent is not a conveyance agreement; it is at best an expression of the parties' interest in <u>pursuing</u> a conveyance agreement. Though ELV would like to bootstrap this expression of interest into a conveyance agreement (hence its claim for specific performance), it is important to distinguish between an agreement to convey and an agreement to negotiate in

---

[1] The real estate aspect of this transaction distinguishes this case from *Rand-Whitney Packaging Corp. v. Robertson Group, Inc.*, 651 F. Supp. 520 (D. Mass. 1986), where the Statute of Frauds was not in issue. Further, unlike the facts there, it would be unreasonable here to find that the parties intended to be bound. *See* Complaint, Ex. A, ¶ 10, pp. 4-5.

good faith towards a conveyance. Only the latter element is truly at issue on these pleadings because POP II did not agree to convey the property in the Letter of Intent.[2] Consequently, any analysis of breach is <u>limited</u> to whether or not the Letter of Intent created a binding obligation to negotiate in good faith.[3]

B. **The Letter Of Intent Does Not Create A Binding Obligation To Negotiate A Final Purchase And Sale Agreement.**

In *Schwanbeck v. Federal-Mogul Corp.*, 412 Mass. 703, 592 N.E.2d 1289 (1992), the Massachusetts Supreme Court considered whether a letter of intent created a binding contract to negotiate in good faith. The letter of intent under consideration in *Schwanbeck* contained the following statement: "it is our intention, and, we understand, your intention immediately to proceed in good faith in the negotiation of such binding definitive agreement..." *Id.* at 706, 1292. The letter of intent also stated that it was not intended to create "any binding legal obligation whatever in any way relating to such sale and purchase" other than for the specific terms listed, none of which included a duty to negotiate in good faith. *Id.*

In considering this language, the court concluded that no express duty to negotiate in good faith had been created. *Id.* In so holding, the court first noted that it is elementary that an unambiguous agreement must be enforced according to its terms. *Id.* In addition, the court

---

[2] While ELV attempts to make the Letter of Intent more definite and certain by reference to the price term, the actual language of the Letter of Intent states that the defined term "Purchase Price" includes not only $15,250,000 but is expressly made "subject to any applicable adjustments and prorations". Exhibit A, p.1, ¶ 1. A letter of intent is not intended to set out all of the necessary terms and provisions for an acquisition, such as the adjustments and prorations the parties agree will affect the purchase price, and without which the final calculations thereof cannot be made.

[3] As a basic principle of law, a valid and enforceable contract must exist before specific performance becomes an available remedy. *See Albrecht v. Abouhamad*, 2000 Mass. Super. LEXIS 17 at *15 (Feb. 2, 2000). As a result, a request for specific performance fails as a matter of law where no contract exists. *Id.* at 14-15.

recognized that "[i]t is a settled principle of contract law that '[a] promise made with an understood intention that it is not legally binding, but only expressive of a present intention, is not a contract.'" *Id.* (*citing Kuzmeskus v. Pickup Motor Co.*, 330 Mass. 490, 493 (1953)). Finding no ambiguity in the parties' intent not to be bound in the agreement, the court held that the mere expression of intent did not ripen into a binding obligation.

Significantly, POP II anticipates that ELV will argue that Paragraph 5(a) of the Letter of Intent relating to good faith negotiation is a separate obligation which falls outside the "no party will be bound" language in Paragraph 10. ELV may argue that the obligation to negotiate in good faith has elevated status as an affirmative undertaking. Paragraph 10 does have a proviso which modifies its language that addresses "other than those provisions hereof which expressly call upon the parties to undertake or refrain from undertaking certain actions".

A similar argument was considered and rejected in *Schwanbeck*.[4] The court concluded that even though the expression of intent to negotiate in good faith followed the parties' disclaimer and began with the word "however" did not elevate its status from a mere expression of intent into a binding obligation. *Id.* at 706, 1292. This conclusion was reached despite the fact that a right of first refusal in that agreement was deemed enforceable. Neither would such an argument be supported by the language of the Letter of Intent since a binding agreement was expressly subject to "negotiations hav[ing] been concluded", *see* Paragraph 10; finding a binding obligation to negotiate would then do violence to this language.

---

[4] In its Complaint, ELV does not discuss what other contractual obligations might instead be referenced by the language in Paragraph 10. However, the Letter of Intent addresses a variety of terms other than the duty to negotiate in good faith. For example, POP II agreed in Paragraph 5(b) of the Letter of Intent not to enter into any agreement to sell the Property to another buyer. The parties also agreed to maintain confidentiality with regard to certain due diligence material in Paragraph 2(a) of the Letter of Intent. Other similar examples exist.

Similarly, in *Newharbor Partners, Inc. v. F.D. Rich Co.*, 961 F.2d 294, 295, 299-300 (1992), the First Circuit Court of Appeals considered whether a letter of intent to form a joint real estate venture created an express duty between the parties to negotiate in good faith under Rhode Island law[5]. There, the letter of intent contained a statement that seemingly obligated the parties to "proceed in good faith." *Id.* at 300. However, the court ultimately held that no express duty to negotiate in good faith was ever created due to contrary language in the letter of intent indicating that it was not binding except to a particular term. *Id.*

In the instant case, the Letter of Intent contains language similar to that found in the letters of intent in *Schwanbeck* and *Newharbor Partners*. Paragraph 10 of the Letter of Intent provides that "no party will be bound by any of the terms" of the Letter of Intent until "a definitive purchase agreement has been executed." This unambiguous expression of the parties' intention should be enforced by the Court and ELV's Complaint should be dismissed for failure to state a claim due to the lack of an enforceable agreement.[6]

C. **ELV's Claim For Breach Of An Implied Covenant Of Good Faith And Fair Dealing Cannot Stand As A Matter Of Law Absent An Underlying Contract.**

Under Massachusetts law, an implied covenant of good faith and fair dealing is implicit in every contract. *See Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 471 (1991).

---

[5] Although Rhode Island law was applied in *Newharbor Partners*, at least one district court in the First Circuit has recognized that the law regarding good faith and fair dealing in Rhode Island does not materially conflict with that of Massachusetts. *Pride Hyundai, Inc. v. Chrysler Financial Co., LLC*, 263 F. Supp. 2d 374, 388 (2003).

[6] Specific performance should not be granted unless the terms of the contract at issue are sufficiently certain to craft an appropriate order. *See* Restatement (Second) of Contracts, § 362 (1981). "Additionally, a judgment of specific performance is proper only when the contract sought to be enforced is clear, definite, and complete." *See Calvary Temple Assembly of God v. Lossman*, 557 N.E.2d 1309 (Ill. App. 1990). Consequently, specific performance is not an available remedy for any alleged breach of a duty to negotiate in good faith.

Under this implied duty of good faith, parties to contracts are prohibited from doing anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Id.*

However, to prevail on a claim of breach of an implied covenant of good faith and fair dealing, there must first be a binding contract between the parties. *See Realty Central, LLC v. Re/Max of New England, Inc.*, File No. 02-01824, 2003 Mass. Super. LEXIS 254 at *19 (Aug. 12, 2003); *Rezendes v. Barrows*, File No. B96-01625, 1998 Mass. Super. LEXIS 427 at *40 (Aug. 11, 1998). An act or omission which occurs during negotiation and not in the performance of any contract cannot form the basis of a claim for breach of an implied covenant of good faith and fair dealing. *See, e.g., JBL Bus Co., Inc. v. Massachusetts Bay Trans. Auth.*, File No. CA 00-0688A, 2001 Mass. Super. LEXIS 372 at *13 (Aug. 1, 2001).

In the instant case, ELV has alleged that POP II breached an implied covenant of good faith and fair dealing by, among other things, refusing to sign a purchase and sale agreement for the Property and using the pre-payment penalty issue to "extract" a "price concession" from ELV. *See* Complaint, Count II. ELV's allegations therefore relate directly to POP II's alleged lack of good faith in negotiating a definitive purchase and sale agreement and do not relate to other terms of the Letter of Intent.

As already demonstrated, the Letter of Intent did not create an express contract between the parties to negotiate a purchase and sale agreement in good faith. As a result, ELV's allegations of breach of an implied covenant of good faith are not based on POP II's performance of any contract. Rather, ELV's allegations relate directly to POP II's conduct in negotiating a separate contract, the anticipated purchase and sale agreement. ELV's claim for breach of an implied covenant of good faith and fair dealing therefore fails as a matter of law.

### D. Promissory Estoppel Does Not Furnish ELV A Claim In Lieu Of Its Failure Of Proof As To A Binding Contract.

Recognizing the weakness of its contractual arguments, ELV included Count III to the Complaint in an effort to create an alternative remedy due to the absence of a binding contract to convey property under the Statute of Frauds. Under Massachusetts law, the elements of a promissory estoppel claim include: 1) a representation intended to induce a course of conduct on the part of the person to whom the representation is made; 2) reasonable reliance upon the representations by that party and, 3) detriment to that party as a result of the reliance. *Hall v. Horizon House Microwave, Inc.*, 24 Mass. App. Ct. 84, 93-94, 506 N.E.2d 178 (1987).

In Count III of its Complaint, ELV asserts a claim for promissory estoppel under these elements based on the unexecuted purchase and sale agreement. *See* Complaint, ¶¶ 38-42. In pursuing a promissory estoppel claim the proponent must demonstrate all elements of the contract other than consideration.

1. ELV Has Failed To Allege Any Representation By POP II That A Final Agreement Had Been Reached.

In order to recover, ELV must demonstrate that POP II represented that a deal existed between POP II and ELV. Indisputably, POP II never represented to ELV that a deal had been reached. To the contrary, the Letter of Intent expressly concludes to the contrary – a deal was being negotiated. Without any representation that a deal existed, ELV's claim fails. As the court found in *David A. Bosworth Co, Inc. v. Roundstone Development Co., Inc.*, Superior Court of Massachusetts, No. 9900803, December 7, 2001 (2001 WL 34042501), absent a representation that a deal existed, promissory estoppel would not lie. *Compare Cellucci v. Sun Oil Co.*, 2 Mass. App. Ct. 722, 725-28 (1974)(holding repeated assurance that a binding deal had been made would support claim for promissory estoppel).

2. <u>ELV Has Not Alleged That It Reasonably Relied On Any Alleged "Representation" of POP II.</u>

If the Letter of Intent can be construed as a representation, ELV has not made a showing that it could reasonably rely upon the Letter of Intent for the existence of a deal between the parties. The *Bosworth, supra,* court found that the fact that the case involved a commercial transaction eroded the claimant's promissory estoppel argument. *Id.* at *2. Citing to *Tull v. Mister Donut Development Corp., supra,* the court found that placing limits on businessmen was not desirable; that the claimant understood this characteristic of commercial transactions; and that therefore any reliance by the claimant on the purported deal under the circumstances of the case and given its commercial nature was unreasonable. *Id.* Neither can ELV demonstrate reasonable reliance in this commercial transaction as a matter of law because it understood that the Letter of Intent was not to be construed as a binding purchase and sale agreement. "Normally the fact that parties contemplate the execution of a final written agreement effects a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled." *Rosenfield v. U. S. Trust Co.,* 290 Mass. 210, 216, 195 N.E. 323, 325 (1935)

3. <u>ELV Cannot Demonstrate Detrimental Reliance Where Any Alleged Detriment Was Waived In The Letter Of Intent.</u>

According to ELV, it incurred substantial due diligence costs in reliance on the unexecuted purchase and sale agreement from the signing of the Letter of Intent to POP II's refusal to sign the purchase and sale agreement. *Id.* at ¶ 24, 40. ELV could not have reasonably relied upon the Letter of Intent as a basis for the investment of due diligence expenses to its detriment as a matter of law.

SEP. 2. 2004 10:28AM CHOATE HALL & STEWART 6172484003 NO. 792 P. 12

Paragraph 10 of the Letter of Intent expressly provides that "[n]either the expenditure of funds by either of us or our undertaking actions to investigate the Property will ... entitle the party expending funds or taking action to any right to assert claims for reimbursement of damages against the other party." In Paragraph 10, therefore, the parties clearly agreed to waive any claims for damages arising from investigation of the Property, including costs associated with due diligence. Given that ELV could not have placed reasonable reliance upon an expectation that its investment of due diligence costs would have yielded an executed agreement under the express language of the Letter of Intent, ELV's promissory estoppel claim fails as a matter of law.

E. **ELV's Claim Under G.L. c. 93A § 2 Fails As a Matter of Law.**

G.L. c. 93A, § 2 creates a private right of action against those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce. In applying G.L. c. 93A, courts must remember that c. 93A is reserved for a "level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *See Pride Hyundai, Inc.*, 263 F. Supp. at 395, note 40 (citing *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979)). In other words, "[i]t is not...immoral, unethical, oppressive, or unscrupulous -- and therefore not unfair or deceptive -- to break off incomplete and imperfect negotiations of a commercial agreement. Every deal that goes sour does not give rise to a c. 93A claim." *Pappas Industrial Parks, Inc. v. Psarros*, 24 Mass. App. Ct. 596, 600 (1987).

For example, in *Pappas Industrial Parks*, two parties experienced in real estate deals, Mr. Pappas and Mr. Psarros, began negotiations to arrange a like-kind exchange of property. *Id.* at 599. When Mr. Psarros pulled out of the deal before signing the agreement, Mr. Pappas filed suit seeking relief under c. 93A. *Id.* at 598-599. The court, however, concluded that Mr. Pappas

could not recover under c. 93A since Mr. Psarros had done nothing immoral, unethical, oppressive, or unscrupulous in refusing to sign the agreement. *Id.* at 600.

In the instant case, ELV has alleged that POP II violated c. 93A by "breaching the implied and express covenants of good faith and fair dealing that it owed to ELV." *See* Complaint, ¶ 44. ELV's claim under c. 93A is therefore based entirely on POP II's refusal to sign the purchase and sale agreement and POP II's alleged use of the pre-payment penalty as justification to increase the purchase price. To the contrary, ELV seeks to use the pre-payment penalty to reduce the value of the property to POP II. Ironically, by drawing a line in the sand and refusing to negotiate with POP II about the pre-payment penalty issue, it is ELV, not POP II, that has refused to conduct good faith negotiation as to the financing problem.

ELV does not allege that POP II fabricated or concealed the approximately $600,000.00 pre-payment penalty, the amount of which became known to POP II during its own diligence. In fact, ELV acknowledges that when POP II informed ELV of the pre-payment penalty, POP II stated that it had "just found out" about the problem. Complaint at ¶ 25. Moreover, POP II remained committed to negotiating a mutually acceptable purchase and sale agreement with ELV even after discovering the pre-payment penalty. *Id.* at ¶ 29. In short, POP II's alleged conduct simply does not rise to the "level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." As such, ELV cannot prevail as a matter of law in its c. 93A claim.

## CONCLUSION

For all of the foregoing reasons, the Court should grant POP II's Motion to Dismiss in full and dismiss ELV's Complaint for failure to state a claim upon which relief can be granted.

Respectfully submitted,

Carlos Perez-Albuerne (BBO #640446)
CHOATE, HALL & STEWART
Exchange Place
53 State Street
Boston, MA 02109
(617) 248-5000

OF COUNSEL:

William M. Droze
Vincent Bushnell
TROUTMAN SANDERS LLP
Bank of America Plaza, Suite 5200
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
(404) 885-3000
Fax: (404) 885-3900

Dated: May 17, 2004

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing **PARK OFFICE PROPERTIES II, LLC'S MOTION TO DISMISS AND BRIEF IN SUPPORT THEREOF** was served upon opposing counsel by placing a copy thereof in the United States mail with adequate postage thereon and addressed as follows:

> Martin M. Fantozzi
> Patrick M. Curran, Jr.
> Goulston & Storrs, P.C.
> 400 Atlantic Avenue
> Boston, Massachusetts 02110-3333

> Carlos Perez-Albuerne