UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 JUN -1  P 3: 41

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| ELV ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-10930-RGS |
| | ) | |
| PARK OFFICE PROPERTIES II, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

Plaintiff ELV Associates, Inc. ("ELV") hereby opposes Defendant Park Office Properties II, LLC's ("Park Office Properties") Motion to Dismiss. As we explain below, the Verified Complaint amply states a claim that Park Office Properties breached its express agreement to diligently negotiate in good faith and to execute a purchase and sale agreement for the office building known as Two Liberty Square in Boston by attempting to leverage ELV into granting a price concession after the parties had fully negotiated and agreed to the terms of a purchase and sale agreement. Consequently, Park Office Properties' assertion that the Verified Complaint fails to state a claim for breach of contract, breach of the implied obligation of good faith and fair dealing, and for unfair and deceptive acts and practices in violation of M.G.L. c. 93A, §§2 and 11 must fail. Park Office Properties' argument that the Verified Complaint also fails to state a claim for promissory estoppel because it does not allege any representation that an agreement had been reached is wrong as a matter of law and simply ignores the e-mail stating "[a]greed as to all points" that was sent by Park Office Properties' attorney in response to the final changes to the purchase and sale agreement proposed by ELV's attorney. As the issue of the reasonableness

of ELV's reliance is an issue of fact not suitable for resolution on a motion to dismiss, Park

Office Properties' motion must be denied.[1]

## BACKGROUND

In early December 2003, ELV learned that the office building located at Two Liberty

Square in Boston, Massachusetts ("Two Liberty Square" or the "Property") was being offered for

sale by Park Office Properties. *See* Verified Complaint at ¶ 6. ELV contacted Park Office

Properties' broker, Spaulding & Slye Colliers ("Spaulding & Slye"), and asked for a copy of the

offering materials for Two Liberty Square. *See id.* at ¶ 7. Shortly after receiving those materials,

which did not contain a price term, ELV learned from Spaulding & Slye that Park Office

Properties had set January 26, 2004 as its deadline for receiving offers from prospective

purchasers. *See id.* at ¶ 7.

Subsequently, ELV contacted Spaulding & Slye and expressed its interest in purchasing

the Property. *See* Verified Complaint at ¶ 8. Spaulding & Slye informed ELV that if it were to

make an offer of $15 million, Park Office Properties would be willing to take the Property off the

---

[1]    The Notice of Removal filed by Park Office Properties on May 10, 2004 fails to allege
facts that would support the subject matter jurisdiction of this Court. Specifically, the
Notice fails adequately to allege Park Office Properties' citizenship for purposes of
diversity jurisdiction, which is the only jurisdictional basis asserted in the Notice.
Although Park Office Properties says that it is a "limited liability company organized and
existing under the laws of the State of Georgia with its principle place of business
located" in Georgia, it is well-settled that for purposes of diversity jurisdiction the
citizenship of a limited liability company is not determined by reference to the state in
which it was organized or has its principal place of business; rather, such an entity is
considered to be a citizen of every state of which any of its members are citizens. *See
JMTR Enters., L.L.C. v. Duchin*, 42 F. Supp. 2d 87, 93-94 (D. Mass. 1999); *accord
Belleville Catering Co. v. Champaign Market Place, L.L.C.*, 350 F.3d 691, 692-93 (7th
Cir. 2003); *Handelsman v. Bedford Village Assocs. Ltd. Partnership*, 213 F.3d 48, 51-52
(2d Cir. 2000). Although ELV has asked Park Office Properties' counsel to supply
documentation establishing its citizenship for diversity purposes, no such documentation
has yet been provided. ELV accordingly reserves its right to move for remand of this
action to Suffolk Superior Court pursuant to 28 U.S.C. § 1447(c).

GSDOCS-1363005-1

market and deal exclusively with ELV. *See id.* Accordingly, on December 18, 2003, ELV submitted a written offer to Spaulding & Slye to purchase Two Liberty Square for $15 million. *See id.* at ¶ 9.

The offer was not immediately accepted. Instead, Spaulding & Slye informed ELV that shortly after receiving ELV's offer, it had received offers to purchase the Property for $15 million from two other prospective purchasers. *See* Verified Complaint at ¶ 9. While Park Office Properties preferred ELV over the other two offerors, according to Spaulding & Slye, it wanted further assurance that the transaction would be concluded as proposed. *See id.* at ¶ 10. To that end, Park Office Properties asked ELV to conduct certain preliminary due diligence regarding the transaction, and also to provide an indication of interest in financing the acquisition from a commercial lender. *See id.* ELV agreed to those terms, completed the requested preliminary due diligence and, by letter dated January 5, 2004, informed Spaulding & Slye of its satisfaction with the results of the preliminary due diligence. In that January 5, 2004 letter, ELV also provided Park Office Properties with a letter of interest from its lender, Anglo-Irish Bank, and asked that the parties move immediately to negotiate a final letter of intent. *Id.*

Park Office Properties responded to ELV's January 5 letter by proposing an increase in the purchase price, from $15 million to $15.5 million. Verified Complaint at ¶ 11. Ultimately, after further negotiations, the parties agreed to a purchase price of $15.25 million. *See id.* at ¶ 12. ELV also agreed, at Park Office Properties' request, to complete all due diligence within its control before January 26, 2004 – Park Office Properties' previously-expressed deadline for receiving purchase offers – so that it would be free to negotiate with other offerors immediately upon the expiration of that deadline if the parties had not reached an agreement by that time. *See id.*

Accordingly, on January 13, 2004, the parties executed a Letter of Intent with respect to the purchase and sale of the Property. Verified Complaint at ¶ 13 & Exh. A. Paragraph 1 of the Letter of Intent memorializes the parties' agreement that "[t]he purchase price for the Property is $15,250,000." *Id.* at ¶ 14 & Exh. A at ¶ 1. Further, in Paragraph 5(a), the parties agreed that "Purchaser and Seller *shall diligently negotiate in good faith and attempt to execute and deliver*, by no later than January 16, 2004, a mutually acceptable purchase and sale agreement incorporating, among other mutually acceptable terms, the terms outlined herein." *Id.* at ¶ 15 & Exh. A at ¶ 5(a) (emphasis added). Of course, the $15.25 million purchase price specified in Paragraph 1 was among "the terms outlined herein." In addition, Paragraph 5(a) further provided that "[i]n the event a Purchase Contract has not been fully executed by January 26, 2004, this letter of intent shall automatically terminate and be of no further force or effect. *Id.*

In Paragraph 10 of the Letter of Intent, the parties specified that certain terms in the Letter of Intent would be binding while others would not be binding. Specifically, the first sentence of Paragraph 10 provides that

> This letter is being written with the understanding that, *other than those provisions hereof which expressly call upon the parties to undertake or refrain from undertaking certain actions upon the execution of this letter of intent* and the indemnities described herein which shall expressly survive, during the period subsequent to the full execution of this letter of intent until negotiations have been concluded, no party will be bound by any of the terms until negotiations have been concluded and a definitive purchase and sale agreement has been executed covering all of the foregoing and such considerations as either of the parties deems appropriate.

Verified Complaint at ¶ 18 & Exh. A at ¶ 10 (emphasis added). In so doing, the parties made clear that the Letter of Intent would not be binding except with respect to those provisions, such as Paragraph 5, "which expressly call upon the parties to undertake or refrain from undertaking certain actions upon the execution of this letter of intent." *Id.*

-4-

As Paragraph 5(a) expressly states that the parties "shall diligently negotiate in good faith and shall attempt to execute and deliver" a purchase and sale agreement for the Property before January 26, 2004, that obligation is obviously among the binding obligations in the Letter of Intent.

Consistent with this obligation, the attorneys for Park Office Properties and ELV exchanged a series of drafts of the Purchase and Sale Agreement between January 13 and January 21 in which they diligently negotiated all of the material terms. *See* Verified Complaint at ¶ 20. On January 21, the parties completed their negotiations. *See id.* at ¶ 21. That evening, ELV's attorney, Michael Haroz, sent an e-mail requesting a minor change to the Purchase and Sale Agreement and suggesting that the parties "wrap up tomorrow as soon as practicable." *See id.* & Exh. B. Park Office Properties' counsel, A. Michelle Willis, Esq., responded by e-mail as follows:

> ***Agreed as to all points.*** The contract is being revised and will be ready for my review in the morning. I will circulate a blackline while we are compiling the exhibits.

*See id.* & Exh. B (emphasis added).

On January 22, as promised, Ms. Willis forwarded clean and blacklined versions of the final agreement to Mr. Haroz by e-mail. Three hours later, Mr. Haroz replied:

> Everything looks fine that you have sent, so let[']s wrap it up; to do this, please have complete execution copies put together and signed by Seller today and send overnight (tonight) to Scott [Jenkins, ELV's Vice President] for signature.

Verified Complaint at ¶¶ 22-23 & Exhs. C, D. In the same e-mail, Mr. Haroz reminded Ms. Willis that ELV's deadline for completing the due diligence within its control was the following Monday, January 26, and thus that "we need to get this signed asap." *See id.* at ¶ 23 & Exh. D. In fact, while it was negotiating the final agreement, and as required by the Letter of Intent, ELV

GSDOCS-1363005-1

was conducting (on an extremely expedited basis) all of the due diligence within its control, including financial analyses, property inspection, engagement of experts to review environmental reports relating to the condition of the Property, and engagement of attorneys to analyze legal and tax issues. *See id.* at ¶ 24. Also during this period, ELV formalized arrangements with Anglo-Irish Bank to obtain financing for the purchase of the Property. *See id.*

On Friday, January 23, 2004 – two days after Ms. Willis sent her "agreed as to all points" e-mail, and one day after she forwarded the final, fully-negotiated agreement to ELV's counsel – Mr. Smith of Spaulding Slye called ELV's Scott Jenkins. Verified Complaint at ¶ 25. Mr. Smith informed Mr. Jenkins that Park Office Properties supposedly had "just found out" that it would owe a pre-payment penalty of approximately $600,000 to its commercial mortgage lender when it sold the Property and prepaid the mortgage in full. *See id.* Consequently, Mr. Smith stated, Park Office Properties would not execute the fully-negotiated Purchase and Sale Agreement that its attorney had sent to ELV for execution on January 22 until the pre-payment penalty issue was resolved. *See id.*

By letter dated January 27, 2004, ELV demanded that Park Office Properties reconsider its position and honor its obligation to sell the Property to ELV. *See* Verified Complaint at ¶ 27 & Exh. E. Notwithstanding this demand, Park Office Properties has not reconsidered its position, and has refused to sign the fully-negotiated purchase and sale agreement at the previously agreed upon purchase price of $15,250,000. *See id.* at ¶ 28. Instead, representatives of Park Office Properties have made clear that if ELV were willing to increase the purchase price by $600,000 – and thus, in effect, to take on the entire burden of Park Office Properties' supposed prepayment penalty – Park Office Properties would sell the Property to ELV. *See id.* at ¶ 29. Representatives of Park Office Properties have also informed ELV that, in their view of

the commercial real estate market in Boston, the Property is worth more than the $15,250,000

purchase price that the parties agreed to in the Letter of Intent and in the fully-negotiated

purchase and sale agreement. *See id.* at ¶ 26.

## DISCUSSION

**I.      The Legal Standard For A Motion To Dismiss Under Rule 12(b)(6).**

A motion under Rule 12(b)(6) has no purpose other than to "test the formal sufficiency of

the statement of the claim for relief," and is not "a procedure for resolving a contest about the

facts or the merits of the case." 5A Wright & Miller, Federal Practice & Procedure, § 1356 at

294 (2d ed. 1990). It is only when the complaint fails to comply with the liberal standard

provided by Rule 8(a) – *i.e.*, to provide a "short and plain statement . . . showing that the pleader

is entitled to relief" – that it is subject to dismissal under Rule 12(b)(6). *See* Wright & Miller, §

1356 at 296. And it is the moving party who has the burden of proving that no claim exists. *Id.*,

§ 1356 at 115 (1996 Supp.).

In deciding whether to grant a motion to dismiss, the court must construe all of the well

pled allegations in the complaint as true and draw all reasonable inferences therefrom in the

plaintiff's favor. *See Martin v. Applied Cellular Tech., Inc.*, 284 F.3d 1, 6 (1st Cir. 2002). As the

Supreme Court has held, "a complaint should not be dismissed for failure to state a claim unless

it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Garrett v.*

*Tandy Corp.*, 295 F.3d 94, 105 (1st Cir. 2002) ("At the Rule 12(b)(6) stage, then, it is enough for

a plaintiff to sketch a scenario which, if subsequently fleshed out by means of appropriate facts,

could support an actionable claim."). Moreover, in instances where the movant seeks dismissal

on the basis of an affirmative defense, it is settled that "the facts establishing the defense must be

GSDOCS-1363005-1

clear 'on the face of the plaintiff's pleadings.'" *Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 197 (1st Cir. 2001) (quoting *Aldahonda-Rivera v. Parke Davis & Co.*, 882 F.2d 590, 591 (1st Cir. 1989)).

## II.    ELV Has Adequately Alleged A Claim For Breach Of The Letter Of Intent.

Count I of the Verified Complaint asserts a claim against Park Office Properties for breach of the express obligation in the Letter of Intent to negotiate in good faith and to attempt to execute and deliver a purchase and sale agreement prior to January 26, 2004.  In its Motion to Dismiss, Park Office Properties argues that Count I fails to state a claim because the Letter of Intent did not create an obligation to negotiate in good faith. *See* Brief in Support of Park Office Properties II, LLC's Motion to Dismiss ("Brief") at 6-9.  Park Office Properties' argument relies primarily on the language of Paragraph 10 of the Letter of Intent and *Schwanbeck v. Federal-Mogul Corporation*, 412 Mass. 703, 706 (1992), where the Supreme Judicial Court held that the parties' statement in the letter of intent at issue in that case of their present intention to proceed in good faith did not create a binding contractual obligation to negotiate in good faith. *See* Brief at 6-8.

In fact, however, *Schwanbeck* supports ELV's position that the Letter of Intent created a binding obligation to negotiate in good faith.  Park Office Properties' argument to the contrary fails to acknowledge the complete holding of *Schwanbeck* and the critical distinction between the language of the letter of intent in that case and the language at issue here.  The relevant portions of the letter in *Schwanbeck* are as follows:

> Of course, this letter is not intended to create, nor do you or we presently have any binding legal obligation whatever in any way relating to such sale and purchase *other than* (i) with respect to the cost of appraisers and the review of OSHA compliance and repairs to remedy flooding . . . and (ii) those arising from the Confidentiality Agreement . . . .  No further obligation will arise until a definitive agreement is reduced to writing and executed by you,

the New Corporation and us and then only to the extent provided for and subject to the terms and conditions (e.g., approval of our Board of Directors) which may be set forth therein.

However, it is our *intention*, and, we understand, your intention immediately to proceed in good faith in the negotiation of such binding definitive agreement . . . .

412 Mass. at 705 n.2 (emphasis added) (alterations in original).

Reversing the decisions of the trial court and the Appeals Court, the SJC held that the statement in the latter of the two paragraphs that the parties "inten[ded] . . . to proceed in good faith" did not create a binding obligation to negotiate in good faith in light of the provision in the preceding paragraph disclaiming any intention to create any binding legal obligations other than those expressly stated in that paragraph. 412 Mass. at 706. Instead, the SJC held, the latter paragraph merely expressed the parties' present "intention." *Id.* In so ruling, the SJC rejected the argument that the word "however" somehow elevated the parties' mutual statement of their present intention into "a binding obligation." *Id.* at 706-07. Importantly, while the SJC held that the letter in *Schwanbeck* did not create a binding obligation to negotiate in good faith, it also held that the obligations specifically excepted from the disclaimer – *i.e.*, the confidentiality and other obligations following the phrase "other than" – were binding and enforceable. *Id.* at 706.

Unlike *Schwanbeck*, the parties in this case did not express their mutual obligation to negotiate in good faith as a mere "intention." On the contrary, the language of Paragraph 5(a) repeatedly uses the mandatory term "shall." *See* Verified Complaint at ¶ 15 & Exh. A at ¶ 5(a) ("Purchaser and Seller *shall* diligently negotiate in good faith and *shall* attempt to execute and deliver . . . a mutually acceptable purchase and sale agreement incorporating, among other mutually acceptable terms, the terms outlined herein"). In addition, the parties expressly provided in the second sentence of Paragraph 5(a) that if, notwithstanding their good faith efforts, they were unable to negotiate and execute a purchase and sale agreement before January

-9-

26, 2004, the Letter of Intent "would automatically terminate and be of no further force or effect." *See id.* If the parties did not intend for Paragraph 5(a) to create an enforceable obligation, as Park Office Properties contends, there would have been no reason to include a sentence stating that it would "terminate" and be of "no further force or effect."

Moreover, unlike *Schwanbeck*, ELV's position that the disclaimer in Paragraph 10 of the Letter of Intent does not apply to the obligation to negotiate in good faith in Paragraph 5(a) does not depend merely upon the introductory word "however." Rather, ELV's position is based on the language of Paragraph 10 itself that *specifically excepts* the obligation to negotiate in good faith, along with all other provisions "which expressly call upon the parties to undertake or refrain from undertaking certain actions," from the disclaimer of binding effect:

> This letter is being written with the understanding that, *other than* those provisions hereof which expressly call upon the parties to undertake or refrain from undertaking certain actions upon the execution of this letter of intent . . . no party shall be bound by any of the terms until negotiations have concluded and a definitive purchase agreement has been executed . . . .

Verified Complaint at ¶ 18 & Exh. A at ¶ 10 (emphasis added). Indeed, the language used to except the good faith obligation in Paragraph 5(a) from the general disclaimer of binding effect – *i.e.*, the phrase "other than" – is precisely the same language that the *Schwanbeck* court found to create an exception from the disclaimer in that case. 412 Mass. at 705 n.2, 706. Thus, contrary to Park Office Properties' argument, the reasoning in *Schwanbeck* actually supports ELV's position that when a commitment made in a letter of intent is expressed in mandatory terms, and is specifically excepted from a general disclaimer of binding effect, it is binding on the parties to the letter of intent.

The only other case relied upon in its Brief, *Newharbor Partners, Inc. v. F.D. Rich Co.*, also does not support Park Office Properties' position that Count I fails to state a claim. 961

F.2d 294 (1st Cir. 1992) (applying Rhode Island law). First, it is important to note that

*Newharbor* was not decided on a motion to dismiss or even for summary judgment; rather, it was

decided on a motion for judgment notwithstanding the verdict after trial. *Id.* at 297-98. Indeed,

the First Circuit went so far as to comment that it would have been improper for the District

Court to have granted summary judgment given the likely issues of fact relating to the

interpretation of the letter of intent in that case. *Id.* at 297.

More importantly, however, the letter of intent at issue in *Newharbor*, like the one in

*Schwanbeck*, contained an express provision in which the parties stated that "nothing herein

except the provisions of (4) above [relating to the disposition of the deposit] will be deemed to

create any legally binding obligations." 961 F.3d at 295 n.3 (alteration in original). In view of

this language, the First Circuit held that the ensuing statement that "the parties shall proceed in

good faith toward the execution of a mutually acceptable definitive and appropriate partnership

document" did not create a binding obligation to negotiate in good faith. *Id.* at 299-300. Had the

parties intended to create such an obligation, the First Circuit reasoned, they could have excluded

the language regarding their intent to proceed in good faith from the operation of the disclaimer

as they did with respect to the obligations in paragraph 4 regarding the deposit. *Id.* at 299.

Like *Schwanbeck*, therefore, *Newharbor* is not controlling here because the obligation to

negotiate in good faith in Paragraph 5(a) of the Letter of Intent *is* excluded from the operative

effect of disclaimer in Paragraph 10. *See* Verified Complaint, Exh. A at ¶ 10. Furthermore, like

the SJC in *Schwanbeck*, the First Circuit in *Newharbor* recognized that when a provision (such as

the good faith obligation here) is specifically excluded from a disclaimer of binding effect, it is

binding. 961 F.2d at 299. Indeed, the Court of Appeals made clear that where an express good

faith obligation is within such an exclusion, it is binding:

> [I]f the letter were drafted clearly, there is no reason why it could not
> expressly provide for a legally binding mutual obligation to act in good faith
> while simultaneously containing a non-binding clause as to the rest of its
> terms.

*Id.* Thus, far from supporting Park Office Properties' view that the parties' agreement in the

Letter of Intent to negotiate in good faith is non-binding, the First Circuit's decision in

*Newharbor* undermines that argument and actually demonstrates that the good faith requirement

at issue in this case is, in fact, binding and enforceable.

The distinction between the Letter of Intent at issue here and those addressed in

*Schwanbeck* and *Newharbor* is illustrated by *Augat, Inc. v. Collier*, Civ. A. No. 92-12165-RCL,

1996 WL 110076 (D. Mass. Feb. 8, 1996). Like the Letter of Intent here, the letter of intent at

issue in *Augat* imposed on the parties, in paragraph four, an obligation "to cooperate with each

other and negotiate in good faith in order to prepare and execute as promptly as possible a

mutually acceptable definitive Purchase Agreement." *Id.* at *33. The letter also contained a

disclaimer provision stating that it was "not intended to create binding obligations ***except for***

***paragraphs three, four and five.***" *Id.* at *29 (emphasis added). As the parties' commitment in

paragraph four to negotiate in good faith was excluded from the disclaimer, the district court held

that the good faith obligation in paragraph four was binding on the parties, and could give rise to

a breach of contract claim. *Id.* at *33; *see also Hunneman Real Estate Corp. v. Norwood Realty,*

*Inc.*, 54 Mass. App. Ct. 416, 425 n.14 (2002) (holding that claim for breach of express covenant

of good faith in a letter of intent could proceed to trial because that covenant "is not qualified by

a disclaimer as was that in *Schwanbeck*"). Since ELV and Park Office Properties excluded their

commitment to diligently negotiate in good faith from the disclaimer in the Letter of Intent as

clearly as the parties did in *Augat*, that obligation is binding and provides a basis for a breach of

contract claim.

In addition to alleging binding obligations in the Letter of Intent, the Verified Complaint also adequately alleges a breach of those obligations. In particular, Paragraph 5(a) required the parties to negotiate in good faith and attempt to deliver a purchase and sale agreement that incorporated "the terms outlined herein," which of course included the purchase price term of $15,250,000. By attempting to renegotiate the price term, and by failing to execute and deliver the fully-negotiated purchase and sale agreement exchanged by the parties' counsel on January 22, Park Office Properties has breached that obligation. *See, e.g., Augat*, 1996 WL 110076, at *34 (holding that there were genuine issues of material fact, precluding summary judgment for Augat on Collier's claim for breach of the express covenant of good faith, concerning among other things "[t]he conduct and motivations of Augat" in seeking "price reductions" from Collier). Accordingly, the Motion to Dismiss Count I must be denied.

### III.    ELV Has Adequately Alleged A Claim Against Park Office Properties For Breach Of The Implied Covenant of Good Faith and Fair Dealing.

Count II of the Verified Complaint alleges a claim for breach of the implied covenant of good faith and fair dealing. It is of course settled that an obligation of good faith and fair dealing is implied in all contracts as a matter of law in Massachusetts. *See Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471, 473 (1991). To the extent that a letter of intent contains legally binding provisions – and thus constitutes a contract – it also includes an implied obligation of good faith and fair dealing. *See, e.g., Schwanbeck*, 412 Mass. at 707 n.3 (observing that "the contractual commitments in the letter of intent incorporated a binding covenant of good faith and fair dealing"); *Newharbor*, 961 F.2d at 299 (observing that "[t]o the extent that a letter

of intent is a legally binding contract, it would impliedly impose on its signatories a duty of good faith and fair dealing").[2]

Here, Park Office Properties claims that the Letter of Intent contains no binding obligation to negotiate in good faith and, therefore, no implied covenant of good faith and fair dealing. Brief at 8-9. As we explain above, however, the provisions in the Letter of Intent that "expressly call upon the parties to undertake or refrain from undertaking certain actions upon the execution of this letter of intent" – including, of course, the provision requiring the parties to negotiate in good faith and attempt to deliver a purchase and sale agreement – are binding on the parties. *See* Verified Complaint, Exh. A at ¶¶ 5(a) & 10. Thus, insofar as the Letter of Intent creates contractual obligations, it imposes an implied duty of good faith and fair dealing on each of the parties.

That implied duty generally obliges a contracting party to be honest in its dealings with the other party, and to not purposefully injure the other party's right to obtain benefits under the contract. *See, e.g., Shawmut Bank, N.A. v. Wayman*, 34 Mass. App. Ct. 20, 25 (1993); *see also Tanol Distributors, Inc. v. Panasonic Co.*, Civ. A. No. 86-3355-S, 1987 WL 13319, at *6 (D. Mass. July 2, 1987) (implied covenant requires that neither party do anything which would destroy or injure the right of the other party to receive the fruits of the contract). The benefits under the Letter of Intent included, among other things, the results that ELV would have obtained if Park Office Properties had honored its obligation to negotiate in good faith and attempt to execute and deliver the purchase and sale agreement. The Verified Complaint adequately alleges that Park Office Properties breached that obligation by raising the issue of a

---

[2]    The court of appeals in *Newharbor* was applying Rhode Island law; as Park Office Properties points out, however, "at least one district court in the First Circuit has recognized that the law regarding good faith and fair dealing in Rhode Island does not materially conflict with that of Massachusetts." Brief at 8 n.5 (citing *Pride Hyundai, Inc. v. Chrysler Fin. Co., LLC*, 263 F. Supp. 2d 374, 388 (D.R.I. 2003)).

GSDOCS-1363005-1

prepayment penalty after the Purchase and Sale Agreement had been fully negotiated as a pretext to extract a higher price from ELV. *See* Verified Complaint at ¶¶ 34-36; *see also Augat*, 1996 WL 110076, at *34 (declining to award summary judgment to Augat on Collier's claim for breach of the implied covenant, because the question "[w]hether Augat failed to negotiate and cooperate with Collier in good faith thereby depriving Collier of the benefits under the contract" remained in dispute). Accordingly, the Court should deny Park Office Properties' motion to dismiss ELV's claim for breach of the implied covenant.

**IV.    ELV Adequately Alleges A Claim Against Park Office Properties For Violation of Mass. G.L. c. 93A.**

It is well-established that conduct in breach of a binding duty of good faith and fair dealing, express or implied, is sufficient to support a claim of "unfair or deceptive acts or practices" in violation Chapter 93A. *See Anthony's Pier Four*, 411 Mass. at 474; *Cherick Distr., Inc. v. Polar Corp.*, 41 Mass. App. Ct. 125, 128 (1996); *see also Concourse Ticket Agency v. Kraft*, No. CA9500666, 1995 WL 809935, at *3 (Mass. Super. Ct. Apr. 3, 1995) (agreeing that defendant's "alleged breach of the implied covenant of good faith and fair dealing establish[es] that the [defendant's] actions were unfair or deceptive in violation of" Chapter 93A). Here, as noted above, the Verified Complaint adequately alleges conduct in breach of the express and implied covenants of good faith contained in the Letter of Intent. Accordingly, Count IV of the Verified Complaint states a claim for violation of Chapter 93A.

Further, when a party uses "a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party," its conduct qualifies as "unfair or deceptive" under Chapter 93A. *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992); *see Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995); *Anthony's Pier Four*, 411 Mass. at 474. Here, ELV has specifically alleged that Park Office

-15-

Properties' asserted basis for refusing to sign the fully-executed purchase and sale agreement

"was pretextual," and that its refusal "represented an effort on Park Office Properties' part to

extract additional financial concessions from ELV." Verified Complaint at ¶ 26. For this reason

also, then, ELV has stated a claim for violation of Chapter 93A in the Verified Complaint. [3]

**V.    ELV Adequately Alleges That The Statute Of Frauds has Been Satisfied And, Alternatively, That Park Office Properties Is Estopped From Relying Upon The Statute of Frauds.**

Park Office Properties begins the Argument section of its brief by contending that ELV

has not alleged an agreement sufficient to satisfy the Statute of Frauds. *See* Brief at 5-6. That

contention is incorrect. There is no question that under Massachusetts law, multiple documents

pertinent to a single transaction may be read together in determining whether the statute of frauds

has been satisfied if the papers at issue are "so connected in the minds of the parties that they

adopted all of them as indicating their purpose." *Tzitzon Realty Co. v. Mustonen*, 352 Mass. 648,

653 (1967); *see Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 198 & n.4 (1st Cir. 2001)

(quoting *Tzitzon Realty*, 352 Mass. at 653); *In re Rolfe*, 710 F.2d 1, 3 (1st Cir. 1983) (observing

that "[a]s the *Restatement* makes clear, for Statute of Frauds purposes a written memorandum

'may consist of several writings' as long as they 'clearly indicate that they relate to the same

transaction,'" and that "'[e]xplicit incorporation by reference is unnecessary,' so long as

evidence of connection between writings is 'clear and convincing'") (quoting *Restatement*

*(Second) of Contracts* § 132) (alterations in original). And as the First Circuit held in *Rolfe*,

---

[3]       In the section of its Brief addressing ELV's Chapter 93A claim, Park Office Properties makes several factual assertions that cannot be found in the Verified Complaint or in any of the documents filed with it. *See, e.g.*, Brief at 13 (accusing ELV of having "refused to conduct good faith negotiation[s] as to the financing problem" by "refusing to negotiate with POP II about the pre-payment penalty issue"). Assertions of this kind are entirely out of place in a Motion to Dismiss, which must be confined to the allegations set out in the complaint. For the record, however, ELV denies that it ever "refus[ed] to negotiate" with Park Office Properties about the pre-payment penalty or about anything else; rather, it is Park Office Properties who refused to negotiate with ELV, instead claiming repeatedly that it was trying to work out a reduction of the penalty with its lender.

where several writings are relied upon "only one" of them needs to be signed for the Statute of Frauds to be satisfied. 710 F.2d at 3. Here, three clearly connected documents – the signed Letter of Intent, the final purchase and sale agreement that Ms. Willis sent to ELV's counsel on January 22, and her January 21 email to ELV's counsel stating her "agree[ment] as to all points" – combine to satisfy the requirements of the Statute of Frauds.

Furthermore, even if the Statute were not satisfied by these series of documents, ELV has adequately alleged facts that would estop Park Office Properties from raising the Statute of Frauds as a defense in this case. As the SJC has held, "[a] plaintiff's detrimental reliance on, or part performance of, an oral agreement to convey property may estop the defendant from pleading the Statute of Frauds as a defense." *Nessralla v. Peck*, 403 Mass. 757, 761 (1989); *see McNamara v. Turturro*, No. 01-P-1044, 2003 WL 22430314, at *1-2 (Mass. App. Ct. Oct. 24, 2003) (holding that, because the plaintiffs had reasonably relied on the defendant's oral promise to repurchase their land, the defendant was estopped from raising the Statute of Frauds as a defense, and affirming order requiring specific performance) (citing *Nessralla*, 403 Mass. at 761). Here, ELV asserts a claim of this kind in Count III of the Verified Complaint, under the rubric of "promissory estoppel." *See* Verified Complaint at ¶¶ 38-42. Such a claim requires (1) a representation made by one party, intended to induce a course of conduct on the part of the party to whom the representation is made, plus (2) reasonable, detrimental reliance by that second party on the representation. *See* Brief at 10 (citing *Hall v. Horizon House Microwave, Inc.*, 24 Mass. App. Ct. 84, 93-94 (1987)).

Park Office Properties argues that the first element of ELV's promissory estoppel claim requires a "representation that a deal existed," and says that the claim fails because no such representation was made here. Brief at 10. Both prongs of that argument are wrong. First, all

that promissory estoppel requires is a "representation" by the party to be charged. The representation may, but need not, be "that a deal existed." *See, e.g., Loranger Constr. Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 760 (1978) (sales engineer's price estimate was sufficient to support claim in the nature of promissory estoppel); *Rooney v. Paul D. Osborne Desk Co., Inc.*, 38 Mass. App. Ct. 82, 83-84 (1995) (promise to issue stock sufficient to support promissory estoppel claim).[4] Thus, for example, Park Office Properties' promise that it would attempt to execute and deliver a purchase and sale agreement containing the terms set out in the Letter of Intent is a "representation" for purposes of the promissory estoppel claim.

Second, Park Office Properties did represent to ELV that a deal existed. On January 22, in response to an email from ELV's counsel suggesting that the parties "wrap up tomorrow as soon as practicable," Park Office Properties' attorney stated that the parties were in agreement "as to all points." *See* Verified Complaint at ¶ 21 & Exh. B. It is difficult to see how that statement could be construed as anything other than a representation that the parties had reached an agreement. Park Office Properties, for its part, offers no alternative construction and, on the contrary, simply ignores its attorney's statement altogether.

Park Office Properties also addresses the second element of the promissory estoppel claim, arguing that ELV could not have reasonably or detrimentally relied on any representation that it made. Brief at 11-12. It is well-established, however, that the "reasonableness" of a party's reliance is not a question susceptible to decision as a matter of law, particularly on a motion to dismiss. *See, e.g., Down East Energy Corp. v. Niagara Fire Ins. Co.*, 176 F.3d 7, 17

---

[4]    The only case cited by Park Office Properties on this point, *David A. Bosworth Co., Inc. v. Roundstone Development Co., Inc.*, No. 9900803, 2001 WL 34042501 (Mass. Super. Ct. Dec. 7, 2001), is not to the contrary. There, the representation alleged by the plaintiff was that the deal "would proceed" – a locution that the court contrasted with a representation that there "was a deal" in holding that the representation alleged was insufficient. *Id.* at *3. In no way did the court suggest, much less hold, that any promise other than one that a deal exists is incapable of supporting a promissory estoppel claim. *See id.*

-18-

(1st Cir. 1999); *Mauser v. Raytheon Co. Pension Plan for Salaried Employees*, 31 F. Supp. 2d

168, 174 (D. Mass. 1998); *Pressman v. Brigham Med. Group Found., Inc.*, 919 F. Supp. 516,

525 (D. Mass. 1996); *Williams v. Watt*, No. 9900696, 2002 WL 1009255, at *7 (Mass. Super. Ct.

Apr. 5, 2002); *Coady v. Wellfleet Marine Corp.*, No. 951407, 2002 WL 1008825, at *4 (Mass.

Super. Ct. Mar. 27, 2002). In any event, there can be little doubt that ELV was entitled to rely,

for example, on Park Office Properties' promise to negotiate in good faith and attempt to deliver

a purchase and sale agreement. *See* Verified Complaint, Exh. A at ¶ 5(a).

As for the required "detriment," the Verified Complaint alleges that ELV incurred

substantial due diligence costs, among other expenses, in reliance on Park Office Properties'

representations. *See* Verified Complaint at ¶ 40. These costs obviously are rendered no less

"detrimental" by the fact that the parties, in the Letter of Intent, agreed not to treat them "as the

partial performance of a binding agreement" or as giving rise to a "claim[] for reimbursement of

damages." *See* Brief at 12 (citing Verified Complaint, Exh. A. at ¶ 10). Park Office Properties'

argument to the contrary is incoherent, unsupported and, ultimately, unconvincing.

## CONCLUSION

For all of the foregoing reasons, Park Office Properties' Motion to Dismiss should be

denied.

## REQUEST FOR ORAL ARGUMENT

ELV believes that oral argument may assist the Court in resolving Park Office Properties'

Motion and therefore requests, pursuant to Local Rule 7.1(D), that the Motion be scheduled for

oral argument.

GSDOCS-1363005-1

**ELV ASSOCIATES, INC.**

By its attorneys,

Martin M. Fantozzi (BBO# 554651)
Patrick M. Curran, Jr. (BBO# 659322)
Goulston & Storrs
A Professional Corporation
400 Atlantic Avenue
Boston, Massachusetts  02110-3333
(617) 482-1776

Dated:  June 1, 2004

GSDOCS-1363005-1